UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
at CHATTANOOGA

| | |
|---|---|
| JOHNNY L. GILREATH | ) |
| | ) |
|     Plaintiff, | ) |
| | ) No. 1:10-CV-7 |
| v. | ) |
| | ) Collier/Lee |
| ROCK-TENN COMPANY, | ) |
| MILL DIVISION, LLC. et al., | ) |
| | ) |
|     Defendants. | ) |

## **MEMORANDUM**

Plaintiff Johnny L. Gilreath ("Plaintiff") brings this lawsuit against his former employer Rock-Tenn Company, Mill Division, LLC and Rock-Tenn Converting Company (collectively "Defendants"), alleging failure to accommodate under the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 *et seq*. Before the Court is Defendants motion for summary judgment, which is supported by a memorandum (Court File Nos. 23, 31). Plaintiff filed a response (Court File No. 35), to which Defendants replied (Court File No. 37). For the following reasons, the Court will **GRANT** Defendants' motion for summary judgment (Court File No. 23).

### I.     RELEVANT FACTS

Plaintiff was hired at Defendants' mill in Chattanooga, Tennessee on May 10, 1999. Defendants' mill is a facility which recycles paper products into cardboard. Plaintiff was employed as an "operator" in the Converting Department. As the operator, Plaintiff led a three-person crew (consisting of himself, a loader, and a bander) setting up and running jobs on a sheeter machine, which was located in a warehouse adjacent to the mill. The operator knows how to perform all three positions, and can step into any position to help ensure the crew does not fall behind. The

Converting Department only operated on the first shift, which means Plaintiff's work hours were from 7:00 a.m. to 3:00 p.m. On January 14, 2008, Plaintiff was terminated for excessive violations of Defendants' attendance policy. According to Plaintiff, his excessive tardiness was due to medication-caused insomnia, a condition Plaintiff contends was a disability within the meaning of the ADA that Defendants had a duty to reasonably accommodate.

In March 2001, Plaintiff sustained a brain injury while boxing in a "Tough Man" competition. This injury caused Plaintiff to experience seizures. To prevent seizures, Plaintiff's doctor placed him on medication. Plaintiff was initially treated with Dilantin and Tegretol, but both medications caused allergic reactions (Court File No. 35-1, p. 10). In May, 2002, Plaintiff began taking Phenobarbital. This drug did not cause an allergic reaction, and was mostly successful at controlling Plaintiff's seizures. In the six years following his injury, during which time Plaintiff was taking Phenobarbital, he only experienced three seizures while at work (*id.* at p. 11).

Known side effects of Phenobarbital include daytime drowsiness and nighttime insomnia (Court File No. 35-3, ¶ 12). According to Plaintiff, during the years he took Phenobarbital he experienced these symptoms and was typically unable to fall asleep until 3:00 a.m. or 4:00 a.m. (Court File No. 35-1, p. 11). Once asleep, Plaintiff had difficulty waking up in time to make it to work for the start of his shift at 7:00 a.m.. Sometimes when his alarm went off at 6:00 a.m. Plaintiff would walk across the room, turn the alarm off, get back in bed and go back to sleep, all while allegedly retaining no memory of doing so (*id.*). Other times Plaintiff's girlfriend would wake him up, Plaintiff would respond "I'm up," his girlfriend would go back to sleep, and then Plaintiff would fall right back asleep, again retaining no memory of his brief wakefulness (*id.* at pp. 11-22). Plaintiff estimates that on work days he averaged three hours of sleep per night (*id.* at p. 11).

However, on days when he was not scheduled to work he would typically sleep until 1:00 p.m. (*id.* at p. 12). Unsurprisingly, Plaintiff's oversleeping resulted in frequent tardiness to work.

Despite Plaintiff's inability to successfully rise to the promptings of his alarm clock and his girlfriend, he was able to wake up on time when his friend and co-worker Denny Wooten picked him up for work. For a six month period following Plaintiff's April 15, 2005 seizure, Mr. Wooten drove Plaintiff to work every day. If Plaintiff was asleep when Mr. Wooten arrived, Mr. Wooten would knock on the window and Plaintiff would wake up (*id.* at p. 20). Plaintiff was never tardy to work when Mr. Wooten picked him up (*id.*). Similarly, Plaintiff had improved success making it to work on time when he received early morning wake-up calls from his parents (*id.* at p. 13).

Defendants enforce a no-fault attendance policy at the plant. Under the policy, employees are assessed points and fractions of points based on the length of tardiness or absence. The accrued points are effective for purposes of corrective action, and expire after six months. Employees who accrue sufficient points are subject to, in ascending order: counseling, verbal warnings, written warnings, three-day suspensions, and finally termination. Accruing eleven points within a six-month period is grounds for termination. Eleven points is equivalent to eleven full days of unexcused absences, twenty-two tardies of between thirty minutes and two hours, or forty-four tardies of up to thirty minutes (Court File No. 23-1, Ex. A).

Plaintiff's tardiness from the first full year he took Phenobarbital until the time of his termination was as follows: in 2002 he was late to work sixteen times; in 2003 he was late to work thirteen times; in 2004 he was late to work eleven times; in 2005 he was late to work twenty-three times; in 2006 he was late to work twenty-two times; and in 2007 he was late to work twenty-six times. During the last six months of his employment – the relevant time period for corrective action

under the attendance policy – Plaintiff was late to work fifteen times. Plaintiff estimates he was typically late by ten to twenty minutes when he overslept (Court File No. 35-1, p. 14); however Defendants' time records show the majority of Plaintiff's tardiness was between thirty and forty-five minutes (Court File No. 23-1, ¶¶ 17-20, Ex. B). Between his hiring in 1999 and his firing in January, 2008, Plaintiff received twenty-five written and verbal warnings and three three-day suspensions for attendance violations (*Id*. at Ex. B).

When Plaintiff was late to work, his vacancy would be filled by operation of the step-up system. Under this system, the other two members of Plaintiff's crew would "step up" to higher positions; that is, the bander would step up to loader, and the loader would step up to Plaintiff's position of operator. An "extra man" – one of a pool of unassigned workers available to fill vacant positions as needed – would then be assigned to the bander position until Plaintiff arrived at work (Court File No. 35-2, pp. 6-7). If no "extra man" was available, Defendants would have to find an employee from a previous shift to cover for Plaintiff, which would entitle that employee to overtime pay (Court File No. 23-1, ¶ 30). Alternatively, Defendants might have to "work short," that is, operate the sheeter machine at a reduced output, with only two employees (Court File No. 23-3, pp. 17-18). Defendants do not have any specific evidence showing the amount of financial loss Plaintiff's tardiness caused them, vis-a-vis extra wages, reduced output, and the like (Court File No. 35-5, p. 14).

There is some dispute about the extent to which Plaintiff did or did not inform Defendants that his tardiness was due to the effects of medication. According to Plaintiff, he communicated this information to both his immediate supervisor Rick Shivley and mill superintendent Mike McDougal on several occasions over the years, and even brought in the Phenobarbital product warning label

on at least one occasion (Court File No. 35-1, p. 12). However, Mr. Shivley and Mr. McDougal both deny Plaintiff ever associated his tardiness with the effects of his anti-seizure medication, or even mentioned having insomnia (Court File No. 35-2, p. 16, 35-5, p. 10).

On January 14, 2008, Plaintiff was terminated from his employment for exceeding the maximum allowable number of points under Defendants' attendance policy. There is a factual dispute over whether Plaintiff raised the issue of his medical condition during his termination meeting (*see* Court File Nos. 35-1, pp. 34-35, 23-3, p. 14). Shortly after being terminated, Plaintiff obtained a new job as a press feeder at National Poster, working the second shift from 3:00 p.m. to 11:00 p.m.. He did not experience difficulty reporting to his job at National Poster on time (Court File No. 35-1, p. 24). In April, 2010, Plaintiff switched from Phenobarbital to the anti-seizure medication Keppra (*id*. at p. 21). In 2005, Plaintiff's doctor had actually recommended he switch from Phenobarbital to Keppra, but Plaintiff did not follow the recommendation because he feared having another seizure during the cross-over period between the two medications (*id*. at pp. 16-17). Since switching to Keppra, Plaintiff's insomnia and sleeping difficulties have disappeared (*id*. at p. 21). In fact, Plaintiff now reports he gets "too many" hours of sleep per night (*id*. at p. 22).

## II.     STANDARD OF REVIEW

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of demonstrating no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Leary v. Daeschner*, 349 F.3d 888, 897 (6th Cir. 2003). The Court views the evidence, including all reasonable inferences, in the light most

favorable to the non-movant. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 (1986); *Nat'l Satellite Sports, Inc. v. Eliadis, Inc.*, 253 F.3d 900, 907 (6th Cir. 2001). However, the non-movant is not entitled to a trial based merely on its allegations; it must submit significant probative evidence to support its claims. *See Celotex*, 477 U.S. at 324; *McLean v. Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). Should the non-movant fail to provide evidence to support an essential element of its case, the movant can meet its burden of demonstrating no genuine issue of material fact exists by pointing out such failure to the court. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989).

At summary judgment, the Court's role is limited to determining whether the case contains sufficient evidence from which a jury could reasonably find for the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). If the Court concludes a fair-minded jury could not return a verdict in favor of the non-movant based on the record, the Court should enter summary judgment. *Id.* at 251-52; *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994).

**III.     ANALYSIS**

Plaintiff has sued Defendants for failing to accommodate his alleged disability of insomnia, in violation of the ADA. He seeks back pay, reinstatement or front pay, compensation for mental anguish, and attorney's fees. Defendants have moved for summary judgment, arguing: (1) Plaintiff's ADA claim fails as a matter of law because he never requested an accommodation from his employer; (2) Plaintiff is not disabled under the ADA; and (3) Plaintiff was not "otherwise qualified" for his position.

A.      The ADA Framework[1]

The ADA states that an employer may not "discriminate against a qualified individual with a disability." 42 U.S.C. § 12112(a). A "qualified" individual is "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of [the] employment position." 42 U.S.C. § 12111(8). "Discrimination" includes an employer's "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified . . . employee unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of [its] business." 42 U.S.C. § 12112(b)(5)(A); *see also U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 396 (2002). In a case alleging an ADA violation based on a reasonable accommodation theory:

> (1) The plaintiff bears the burden of establishing that he or she is disabled.
> (2) The plaintiff bears the burden of establishing that he or she is "otherwise qualified" for the position despite his or her disability:
>     (a) without accommodation from the employer;
>     (b) with an alleged "essential" job requirement eliminated; or
>     (c) with a proposed reasonable accommodation.
> (3) The employer will bear the burden of proving that a challenged job criterion is essential, and therefore a business necessity, or that a proposed accommodation will impose an undue hardship upon the employer

*Kleiber v. Honda of Am. Mfg.*, 485 F.3d 862, 869 (6th Cir. 2007) (citation omitted).

The parties spend considerable portions of their briefs arguing the threshold matter of whether Plaintiff's alleged disability was "known" to Defendants. Since employers are only obligated to reasonably accommodate "*the known* physical or mental limitations" of an otherwise

---

[1] Because the relevant conduct in this case occurred before the ADA Amendments Act of 2008 ("ADAAA") became effective on January 1, 2009, *see* Pub. L. No. 110-325, § 8, 122 Stat. 3553, 3559 (2008), this memorandum references and appies the pre-amendment version of the ADA. *See Milholland v. Sumner Cnty. Bd. of Educ.*, 569 F.3d 562, 567 (6th Cir. 2009) (holding the ADAAA does not apply to pre-amendment conduct).

7

qualified employee, 42 U.S.C. § 12112(b)(5)(A), an employee generally must inform his employer of his need for accommodation before the employer's duty to accommodate is triggered. *See Clark v. Whirlpool Corp.*, 109 F. App'x 750, 755 (6th Cir. 2004) ("[T]here is no question that the EEOC has placed the initial burden of requesting an accommodation on the employee. The employer is not required to speculate as to the extent of the employee's disability or the employee's need or desire for an accommodation.") (citation omitted).

Defendants contend the fact that Plaintiff, by his own admission, never explicitly requested an accommodation means no duty to accommodate was ever triggered. Plaintiff, for his part, argues the occasions when he told Defendants his tardiness was due to the side effects of Phenobarbital were essentially, though not explicitly, requests for accommodation. The Court regards as a close question whether, as a matter of law, informing one's employer that medication-caused morning inertia is to blame for one's tardiness can be tantamount to a "request" for accommodation. However, the Court finds it unnecessary to decide this question since a more fundamental barrier stands in the way of Plaintiff's claim: he is not disabled within the meaning of the ADA.

**B.     ADA Disability**

The ADA defines "disability" with respect to an individual as "a physical or mental impairment that substantially limits one or more of the major life activities of such individual." 42 U.S.C. § 12102(2)(A)[2]. Under regulations promulgated by the Equal Employment Opportunity Commission ("EEOC"), a person is substantially limited in performing a major life activity when he is either unable to perform such activity, or is "significantly restricted as to the condition, manner

---

[2]The other two prongs of the ADA's definition of disability: being "regarded as" having a substantially limiting impairment, or having a record of such an impairment, are not at issue in this case. *See* 42 U.S.C. §§ 12102(2)(B)-(C).

or duration" under which he can perform the activity, relative to the general population. 29 C.F.R. § 1630.2(j)(1). "Major life activities" include functions such as "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." *Id.* at § 1630.2(i). The Sixth Circuit considers sleeping to be a major life activity. *Swanson v. Univ. of Cincinnati*, 268 F.3d 307, 315 (6th Cir. 2001).

Plaintiff contends his medication-caused insomnia substantially limited the major life activity of sleeping, and was therefore a disability.[3] However, neither the facts nor Sixth Circuit precedent support this conclusion. In *Boerst v. General Mills Operations*, 25 F. App'x 403 (6th Cir. 2002), the Sixth Circuit affirmed summary judgment for the defendant in a case where the plaintiff claimed his major life activities of sleeping and working were substantially impaired because he could only achieve two-to-four hours of sleep per night. The court held "[g]etting between two and four hours of sleep a night, while inconvenient, simply lacks the kind of severity we require of an ailment before we will say that the ailment qualifies as a substantial limitation under the ADA." *Boerst v. Gen. Mills Operations*, 25 F. App'x 403, 407 (6th Cir. 2002). More recently, the Sixth Circuit, relying on *Boerst*, held an appellant's sleep problems did not rise to the level of substantial impairment where he allegedly could sleep for only 2.5-3 hours per night during the work week, and longer on the weekends. *Simpson v. Vanderbilt Univ.*, 359 F. App'x 562, 567 (6th Cir. 2009). Notably, the *Simpson* Court explicitly declined to follow a D.C. Circuit decision which held the question of whether two-to-four hours of sleep per night rose to the level of a substantial limitation was a factual question suited for the jury. *Id*.

---

[3]The parties do not dispute that Plaintiff's seizure condition and medication-caused sleep problems constitute an "impairment."

Here, Plaintiff alleges that while on Phenobarbital he achieved an average of three hours of sleep on work nights, and roughly nine hours of sleep on non-work nights. His sleep level is thus within the range of the appellants in both *Boerst* and *Simpson*. While such a sleep problem is surely inconvenient, it simply does not rise to the level of substantial limitation within the meaning of the ADA. Plaintiff's attempts to distinguish his case from *Boerst* and *Simpson* are unavailing. Plaintiff compares his case to *Marziale v. BP Products North America, Inc.*, No. 1:05-CV-741, 2007 WL 4224367, at *7 (S.D. Ohio Nov. 27, 2007), in which the district court found a plaintiff presented sufficient evidence to show she was substantially limited in the major life activity of sleeping. However, in that case the plaintiff, in addition to only being able to sleep for two-to-three hours per night, was unable to experience uninterrupted sleep for more than 20 minutes to an hour – and that only with the use of sleep-aiding medication. *Id*. In contrast, Plaintiff in this case had no trouble staying asleep – in fact, his tardiness sprung from the fact that he found it so difficult to *stop* sleeping.

Additionally, Plaintiff claims his sleeping problems are distinguishable from the appellant in *Boerst*, because that appellant's sleep problems eventually improved through medication, while Plaintiff's did not. However, this claim is neither apposite nor true. The *Boerst* Court based its ruling entirely on the proposition that getting between two and four hours of sleep per night is not, as a matter of law, a substantial limitation under the ADA. *See Boerst*, 25 F. App'x at 407. Its analysis did not turn upon, or even consider, the fact that the plaintiff's sleep eventually improved with medication. *Id*. Additionally, Plaintiff's sleep problems *did* eventually improve through medication. In 2005 Plaintiff's doctor recommended he switch from Phenobarbital to Keppra, after Plaintiff told the doctor about his insomnia (Court File No. 35-1, p. 17). Plaintiff, fearing another

seizure if he switched medications, did not follow the doctor's recommendation (*id*. at pp. 16-17). However, in 2010 Plaintiff did finally switch to Keppra, at which time his sleep problems went away (*id*. at p. 21). Thus, even if the rule that two-to-four hours of sleep is not a substantial limitation were premised on an individual's ability to improve with medication – which it is not – Plaintiff's case would nonetheless fall within the rule.[4]

Because Plaintiff's level of sleep impairment did not substantially limit him in the major life activity of sleep, he was not actually disabled under the ADA. Thus, it is not necessary for the Court to reach the further issue of whether Plaintiff was "otherwise qualified" for his position, either without accommodation, with a non-essential job function eliminated, or with reasonable accommodation. Because Plaintiff was not disabled under the ADA, he cannot raise a genuine issue of material fact on his ADA failure to accommodate claim. Accordingly, Defendants are entitled to summary judgment.

## IV. CONCLUSION

The Court concludes there is no genuine issue of material fact as to Plaintiff's ADA failure to accommodate claim. Accordingly, the Court will **GRANT** Defendants motion for summary

---

[4]Additionally, the amenability of Plaintiff's sleep problems to correction through medication weighs against finding he was substantially limited in the activity of sleeping for. Under the pre-amendment ADA, a person whose physical or mental impairment is corrected by medication or other measures does not have an impairment that substantially limits a major life activity. *Sutton v. United Air Lines*, 527 U.S. 471, 482-83 (U.S. 1999). Thus, the fact that a change in Plaintiff's anti-seizure medication ended his insomnia – a change recommended but declined in 2005 – counsels against a finding of substantial impairment. Moreover, it is undisputed that other measures such as wake-up phone calls and carpooling with a friend successfully overcame the limitations of Plaintiff's impaired ability to "get up and go" in the morning. The efficacy of these corrective measures likewise counsel against a finding of substantial impairment.

judgment (Court File No. 23).

An Order shall enter.

/s/
**CURTIS L. COLLIER**
**CHIEF UNITED STATES DISTRICT JUDGE**